# EXHIBIT 4

# DAY PITNEY LLP

BOSTON   CONNECTICUT   FLORIDA   NEW JERSEY   NEW YORK   PROVIDENCE   WASHINGTON, DC

STANLEY A. TWARDY, JR.
Attorney at Law

One Stamford Plaza, 7th Floor
263 Tresser Boulevard
Stamford, CT 06901
T: (203) 977-7368 F: (866) 458-1037
satwardy@daypitney.com

August 23, 2024

**VIA E-FILING**

Chief Judge Martin Glenn
U.S. Bankruptcy Court, S.D.N.Y.
One Bowling Green
New York, NY 10004-1408

    Re:    In re: Frontier Communications Corp., No. 20-22476-mg

Dear Judge Glenn:

Pursuant to this Court's order (ECF No. 2415), we write on behalf of Frontier Communications Corporation ("Frontier") in response to the letter of the Movie Company Claimants ("MCCs") requesting leave to file a motion for spoliation sanctions (ECF No. 2413).

MCCs' sanctions request is wrong on both the facts and the law. MCCs overlook the fact that, even before receiving MCCs' demand letter, Frontier had already preserved its DMCA database, which records DMCA notices and information about the subscriber accounts assigned the IP addresses in those notices. It was therefore not reasonable for Frontier to also preserve its much larger database storing IP assignment information for all subscribers—over 98% of which are never linked to a DMCA notice. As a legal matter, even if MCCs could show that Frontier's preservation efforts were unreasonable, it cannot obtain the adverse inferences it requests without also showing that Frontier destroyed data for the purpose of depriving MCCs of its use. MCCs have not even attempted to make that showing and cannot do so.

**Frontier Preserved its DMCA Database**

By the time Frontier received MCCs' March 2020 demand letter (ECF No. 2302-1), it had already taken steps to preserve its DMCA database maintained in MariaDB (the "DMCA Database"). To understand the significance of this step, it is helpful to understand what information the DMCA Database contains. This database contains millions of entries, including several tables that link or can be used to link IP addresses in DMCA notices to subscriber accounts.

**DAY PITNEY LLP**

Chief Judge Martin Glenn
August 23, 2024
Page 2

     *First*, the Reports table records information about each email notice alleging copyright infringement ("Notice") Frontier receives, including in particular the IP address contained in the Notice, the time of the alleged infringement, and information about the subscriber account that was assigned this IP address at that time. (*See* Ex. A, at 1.) The subscriber account is identified through an automated query of RADIUS, a different database that contains information about the dynamic IP addresses assigned to Frontier's millions of subscribers—the vast majority of whom are never the subject of a Notice.[1] (*See* Ex. B, Levan 4/10/24 Dep. 61:18-62:3, 117:7-118:8.) In most cases, the RADIUS query identifies an account username that can be linked to other information about the subscriber, such as a name or account number. But in some cases, RADIUS cannot link an IP address to a subscriber account, instead identifying only the machine address of the modem or a nearby network hub. (Ex. C, Levan 6/6/24 Dep. 148:11-150:23.)

     Frontier's practice had been to retain Reports table data for a period of six months, but in March 2020 it extended that retention period to twelve months, and later extended it indefinitely. (Ex. B, Levan 4/10/24 Dep. 24:21-30:10.) As a result, Frontier has retained from September 2, 2019 to the present, all Reports table data linking the IP addresses in Notices to particular subscriber accounts to the extent this was possible. This comprises over 1.3 million notices through March 2024. Importantly, in a small number of cases, as described above, it was never possible for Frontier to link the IP address specified in an incoming Notice to a specific subscriber account.[2]

     *Second*, the Notifications table contains email notifications ("Notifications") that Frontier sends to subscribers after certain thresholds are met advising them of the accusations of copyright infringement and reminding them of Frontier's policy prohibiting such conduct. While the Notifications table does not contain IP address information, it does identify subscriber accounts and contains a unique identifier (a "Case ID") included in the Notice that triggered the Notification. Because MCCs have the Notices they sent, which include IP addresses and Case IDs, they can use Notifications data to link IP addresses and subscribers. Record Company

---

[1] For example, in 2020, Frontier received 350,585 Notices, which it linked to 51,659 subscriber accounts comprising only 1.72% of its 3 million subscribers.

[2] MCCs wrongly claim that Frontier has given conflicting explanations for its inability to identify subscribers associated with the IP addresses in certain Notices. Counsel's statement in a March 2024 email that Frontier "never" had certain IP address information was true. (ECF No. 2302-7.) Even Frontier's RADIUS database is in some cases unable to link an IP address with a subscriber account. Frontier's later admission that it "did not maintain all IP address assignment records older than 18 months" does not speak to that issue and is not inconsistent. Nor was it inconsistent to state that the data for certain IP addresses "was no longer available due to it being for 'former customers and for whom Frontier had no email or physical address information.'" In any case, a misstatement about preservation is insufficient to support an inference of spoliation. *See, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13CV2581, 2021 WL 4190628, at *19 (S.D.N.Y. Aug. 18, 2021).

**DAY PITNEY LLP**

Chief Judge Martin Glenn
August 23, 2024
Page 3

Claimants' ("RCCs") expert did just that to identify subscriber accounts linked to Notices that RCCs sent prior to September 2019.

Frontier had no retention restriction on entries in the Notifications Table, and, as a result, Frontier has records of all Notifications sent from 2013 to the present—approximately 6 million Notifications.[3]

**Frontier Preserved Syslog Files**

Frontier uses a script—a computer program written in Python—called dmca-xml.py to process incoming Notices, send Notifications, and place subscribers in a Walled Garden. The script records certain processing steps as well as errors in processing in daily system log ("syslog") files. These syslog files only reflect processing of emails Frontier received, and do not record emails that are never delivered to Frontier because, for example, they are not are not accepted by Frontier's email service (Yahoo!). Frontier ordinarily retains these syslog files for a period of 45 days. In March 2021, after evaluating RCCs' and MCCs' claims, Frontier retained syslog files indefinitely, thereby ensuring that all syslog files from February 6, 2021 onward were retained.

**Frontier Complied with Its Preservation Obligations**

Frontier took steps to preserve documents it reasonably understood to be relevant to MCCs' claims. While MCCs now claim Frontier should have preserved more, the relevant inquiry is what Frontier reasonably understood to be relevant in March 2020, based on MCCs' demand letter. *See* Fed. R. Civ. P. 37, Advisory Committee Notes (where a party has "limited information about . . . prospective litigation, the scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.").[4] This is particularly true where, as here, information is lost due to "the routine, good-faith operation of an electronic information system." *Id.* Preservation efforts must also be proportional to the claims, and "[a] party may act reasonably by choosing a less costly form of information preservation, if it is substantially as effective as more costly forms." *Id.*

---

[3] The DMCA Database also includes a table concerning Walled Garden intercepts, but this table is not relevant to the present issues.

[4] Rule 37(e) is applicable in this contested matter pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7037. *See* Fed. R. Bankr. P. 9014(c), 7037. To the extent MCCs rely on Frontier's alleged failure to comply with its own document retention policies, any such failure is not sanctionable.

20-22476, Case 3:24-cv-02005, Filed 08/23/2024, Document 2465, Entered 08/23/24 14:25:19, Page 5 of 8, Main Document Pg 4 of 7

Case: 24-3893, 10/08/2024, DktEntry: 14.3, Page 5 of 8

**DAY PITNEY LLP**

Chief Judge Martin Glenn
August 23, 2024
Page 4

   Judged by these applicable standards, Frontier's preservation efforts were reasonable and appropriate. At the time it received MCCs' March 2020 demand letter, Frontier had already preserved its DMCA Database—its core source of data on Notices alleging copyright infringement, which specifically links subscriber accounts to the IP addresses in Notices. Given this, Frontier reasonably did not recognize the need to preserve more, including entire databases not directly related to the allegations in the claims.

   MCCs' December 2020 email describing "topics" on which they "would be seeking discovery" (ECF No. 2413-1) listed numerous topics, but did *not* tell Frontier that it needed to preserve its massive RADIUS database or its syslog files nor were there any facts then known to Frontier that reasonably would have led Frontier to understand the need to do so.[5] The email said nothing about processing errors or the need for IP lease logs that MCCs requested much later. To be sure, MCCs referred to "subscriber names for the IP addresses where we confirmed and/or observed infringements between 2016 and present." (*Id.*) But the DMCA Database Frontier had already preserved contained IP address assignment information to the extent it had ever been captured by Frontier for MCCs' Notices, and Frontier could not have seen a reason in 2020 or later to separately preserve RADIUS data for the same purpose.

   Nor could Frontier have been expected to indefinitely suspend its normal retention policy for the entirety of its RADIUS database containing IP assignment data on millions of subscribers that have nothing to do with MCCs' claims—especially because the DMCA Database captured this information for the Notices at issue from a date preceding MCCs' demand letter. Frontier had even less reason to believe syslog files were relevant to MCCs' claims, as their demand letter said nothing about such files or even about errors or defects in Frontier's processing of Notices. (ECF No. 2303-1.)

**Frontier Did Not Intend to Deprive MCCs of any Evidence**

   Even if MCCs could show that Frontier's preservation efforts were not reasonable, MCCs have failed to show that Frontier acted with "intent to deprive" MCCs of evidence in this litigation. "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 66 (S.D.N.Y. 2020) (quoting *Leidig v. Buzzfeed, Inc.*, No. 16 CIV. 542, 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017)). MCCs

---

   [5] MCCs' own conduct shows that it only recently appreciated the potential relevance of processing errors. It was not until May 2024—after the deadline for completion of substantial discovery—that MCCs produced emails from its email client notifying MCCs that some of the Notices it sent to Frontier were undeliverable. The vast majority of these emails were from 2023—after the period covered by MCCs' claims, with only a dozen from 2020 and none before that. It may be the case, ironically, that MCCs' own agent did not preserve most of these communications.

**DAY PITNEY LLP**

Chief Judge Martin Glenn
August 23, 2024
Page 5

must demonstrate such an intent by "clear and convincing evidence" and thus cannot rely on "suspicion alone." *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15CV9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018).

MCCs claim that Frontier intentionally deleted RADIUS data and syslog files but offer no basis for this claim, let alone an evidential basis sufficient to meet the exacting standards of Rule 37(e). Their effort falls short for two reasons. First, MCCs have not pointed to *any* evidence, much less clear and convincing evidence, that Frontier personnel acted with the "intent to actually deprive [MCCs] of evidence." *Charleston Cap. Advisors*, 337 F.R.D. at 66. MCCs can point to no testimony among the numerous depositions it took of Frontier personnel and no document in Frontier's extensive document production even hinting at such an intent.

Second, one cannot infer merely from the loss of some evidence after receipt of a demand letter that Frontier must have acted with intent. No such inference is appropriate, as his data was automatically deleted as a result of "the routine, good-faith operation of an electronic information system," not due to any intentional, affirmative act. *See Richard v. Dignean*, No. 6:11-CV-06013 EAW, 2021 WL 5782106, at *6 (W.D.N.Y. Dec. 7, 2021) (requiring "an affirmative act causing the evidence to be lost" to draw a circumstantial inference of intent to deprive). In essence, MCCs ask the Court to infer that Frontier acted intentionally to delete a very small amount of marginally relevant information while simultaneously, undisputedly preserving the great majority of that same information. The accurate, fact-based, and more logical inference to draw is that Frontier acted to preserve that information which it understood was likely to be required as soon as it recognized the need.

**MCCs Have Not Shown Prejudice**

MCCs have also failed to show that they were materially prejudiced by the loss of any information. Rule 37(e)(1) "permits the imposition of sanctions only when there is 'prejudice to another party from loss of the information.'" *Leidig*, 2017 WL 6512353, at *12. "[A]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." *Id.* (quoting Fed. R. Civ. P. 37, Advisory Committee Notes).

Here, the IP address information at issue has little importance for MCCs' case. MCCs complain that they cannot make their case using Frontier's own data. But as explained above, MCCs already have ample Frontier data from the Reports and Notifications tables that they can use to identify subscribers associated with Notices going all the way back to their earliest claims in 2017. RADIUS data would add little to this evidence, and nothing for the period after September 2, 2019. If Frontier had preserved information in the RADIUS database from March 2020, MCCs would still not have had all the information they wish to have, but would have been able to link IP addresses to subscribers using Frontier's own data back to March 2018. Instead, however, MCCs can do the same thing using the CaseID in the Notifications table together with their own Notices. MCCs can thus identify subscriber accounts associated with many additional

**DAY PITNEY LLP**

Chief Judge Martin Glenn
August 23, 2024
Page 6

Notices they claim to have sent between March 2018 and August 2019, just not reliant entirely on Frontier's data. There remains a subset of Notices that MCCs claim to have sent for which it may not be possible to identify a subscriber, but MCCs have not shown and cannot show that this has a material bearing on their claims both because these subscribers may already have been identified through other Notices and because any movies these subscribers may have shared may have been shared by other subscribers.

Similarly, MCCs are not prejudiced by the loss of early syslog files. These files would not show why some of MCCs' Notices were not deliverable to Frontier, which is why MCCs' claim they need them. Moreover, the syslog files Frontier has maintained and produced cover multiple years and are sufficient to evaluate the performance of its automated DMCA systems.

**MCCs Are Not Entitled to the Adverse Inferences They Seek**

MCCs are not entitled to any adverse inference because they have not shown and cannot show any intentional spoliation. Rule 37(e)(2) permits an adverse inference "*only* upon finding that the party acted with the intent to deprive." Fed. R. Civ. P. 37(e)(2) (emphasis added). MCCs cannot circumvent this express limitation by asking for the same relief under Rule 37(e)(1). *Leidig*, 2017 WL 6512353, at *13 ("[C]are must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2)." (quoting Fed. R. Civ. P 37, Advisory Committee Notes)).

In any case, MCCs' requested adverse inferences are unwarranted. MCCs first ask the Court to "presume that for each unique IP address for which multiple notices were sent to Frontier prior to 8/31/2022, that the same customer was assigned the unique IP address." Because Frontier assigned dynamic IP addresses to most of its subscribers, this assertion is not always true. It is inappropriate to presume it.

MCCs' second requested adverse inference—that Frontier subscribers actually engaged in direct infringement and committed section 1202 violations—is a vast overreach. Such inferences, which would resolve key issues in the case against Frontier other than on the merits, would be wholly unwarranted and inappropriate even if Frontier had intentionally engaged in spoliation. Any such inference is unrelated to the alleged spoliation. RADIUS data only facilitates the identification of a subscriber account associated with a particular IP address, but does not show any internet activity at that address. Moreover, despite MCCs' hyperbolic claim that they were able to obtain useful admissions from subscribers, many of the subscribers who responded to MCCs' subpoenas appear to have provided no useful information or even denied MCCs' allegations. (*See, e.g.*, Ex. D.)

For these reasons, the Court should deny MCCs' request for leave to file a sanctions motion. To the extent that the Court grants MCCs leave to file a sanctions motion over Frontier's

**DAY PITNEY** LLP

Chief Judge Martin Glenn
August 23, 2024
Page 7

objection, Frontier respectfully requests that the Court order briefing on the motion on the schedule proposed in its letter (ECF No. 2414).

          Respectfully submitted,

          Stanley A. Twardy, Jr.

cc:    All Counsel of Record